Not for Publication

# UNITED STATES DISTRICT COURT
## DISTRICT OF NEW JERSEY

|  |  |
|---|---|
| CAMILE WILLIAMS, | |
| Petitioner, | Civil Action No. 18-1251 (ES) |
| v. | OPINION |
| PATRICK NOGAN, | |
| Respondent. | |

SALAS, DISTRICT JUDGE

Petitioner Camile Williams is a state prisoner confined at East Jersey State Prison in Rahway, New Jersey. He brings a *pro se* petition for a writ of habeas corpus pursuant to 28 U.S.C. § 2254. (D.E. No. 1, Petition). For the following reasons, the Petition in DENIED and a certificate of appealability shall NOT ISSUE.

## I.      BACKGROUND

The New Jersey Superior Court, Appellate Division provided the following factual summary on direct appeal:[1]

> At about 10:00 p.m. on January 20, 2006, four men armed with handguns and wearing ski masks entered Cherry's Bar in Jersey City. One of the men jumped over the bar and began "ransacking the cash registers." A second man approached bartender Charles Bratton and pointed a gun at him. He ordered Bratton to come out from behind the bar, and struck him in the head with the butt of his gun. The man then pointed his gun at another bar employee, Annie Johnson, and ordered her to retrieve the bar's safe, which was kept in a back room. According to Bratton, the safe likely contained $4000 or $5000. Bratton did not recall that anything was stolen from

---

[1]      Pursuant to 28 U.S.C. § 2254(e)(1), "[i]n a proceeding instituted by an application for a writ of habeas corpus by a person in custody pursuant to the judgment of a State court, a determination of a factual issue made by a State court shall be presumed to be correct. The applicant shall have the burden of rebutting the presumption of correctness by clear and convincing evidence."

the bar's patrons who remained seated at the bar.  The men fled after emptying the safe.

Sometime between 6:00 and 7:00 p.m. on January 26, 2006, four or five men armed with handguns and wearing ski masks rushed into Bill and Ruth's Bar in Jersey City, shouting, "Get down… on the ground."  One of the men ran behind the bar, approached the owner, Emma Ruth Moore, and pointed a gun at her head while demanding she "give [him] the money."  Moore gave the man all of the money in the register, and also handed over a small safe she kept in the kitchen.  The other armed men searched the bar patrons, who were lying on the floor, for money and valuables.  Before the men ran out of the bar they kicked several of the patrons.  Moore estimated that the men made off with over $200.

During the afternoon of February 4, 2006, Charlene Hatcher was getting her hair done at the Santo Domingo Hair Salon in Jersey City when two men armed with handguns and wearing ski masks entered the salon.  They pointed their guns at the roughly fifteen people inside, announced it was "a stickup," and demanded that everyone get down on the floor.  The men went behind the reception desk and then ordered the stylist at gunpoint to "open the safe."  The men left shortly afterwards.  Hatcher did not identify by name any of the patrons in the salon, and confirmed that nothing was stolen from her.

At approximately 8:30 p.m. on February 16, 2006, three men armed with handguns and wearing ski masks entered the Virginia Bar Tavern in Jersey City.  One man put a gun to bar owner Frank Cuozze's head, threatened to blow his head off, and demanded to know where he kept the money.  He brought Cuozze over to the register, where another man was taking $300 from it and was taking the extra cash Cuozze kept in a bag next to the register.  A third man pointed a gun at the three bar patrons, Margaret Keelan, Alberto Serrano, and Tyrone Tucker.  The first man demanded Cuozze give him the $300-$400 he had in his pockets, and then he hit Cuozze in the back of the head with the gun and made him lay on the floor.  He continued to demand to know where the money was, and fired a shot above Cuozze.  The men made Tucker lie on the floor and then took Serrano's wallet and Keelan's pocketbook.  The men left shortly after firing the shot.

At about 9:00 p.m. on March 2, 2006, Royal Lanier and her two young daughters, ages eight and ten, were at a hair salon called Monique's Techniques in Jersey City when an armed intruder wearing a ski mask entered and ordered everyone to the ground.  According to Lanier, the only other people in the salon were her

stylist "Sophia" and another customer whom she identified as "Miss Freeman." The man pointed his gun at the women and then held the gun to Sophia's head. Lanier's children begged the intruder not to kill Lanier or anyone else. The man searched the register and various work stations for money, and demanded all valuables. Before leaving, the man pulled out a roll of tape and ordered Lanier's two daughters to bind the wrists of the adults in the salon. He directed the children not to remove the tape until he was gone. The man did not take anything from Lanier or her children.

Shortly before 11 p.m. on March 17, 2006, an armed robber wearing a mask entered the Burger King on Bergen Avenue in Jersey City and pointed a gun at employee Droanne Ray. After learning that Ray could not open the restaurant's safe, he ordered her to give him the money from the registers. He directed the other employees to lay on the floor. The man pushed his gun against Ray's head as she handed over approximately $1000 in cash and some employee checks. After instructing Ray to lay on the floor, the man ran out.

Sometime after 7:15 a.m. on March 24, 2006, a young man wearing a mask entered the Burger King on Route 440 in Jersey City and pulled out a gun. He grabbed the manager by the shirt, pointed his gun at employee Ethel Wilson and ordered them both into the back office. The intruder directed the manager to open the safe while still keeping his gun pressed against Wilson's head. The manager gave the robber all of the money in the safe. The robber then brought the pair back out front and ordered the manager to empty all of the registers. After the manager handed over these additional monies, the robber ordered the two women to lay on the floor on their stomachs and proceeded to use duct tape to tape their hands and feet together before fleeing.

Sometime around midnight on March 31, 2006, an armed robber wearing a mask approached Kareen Beebers who was taking out the trash at the Wendy's on Route 440 in Jersey City. He put a gun to Beebers's back, and forced him back into the restaurant. The man then approached a female employee, pushed her to the floor and put his gun to her head. He said he was going to shoot unless the manager opened the office. The manager opened the office door and the robber proceeded to strike her in the face with the gun and to demand money. The manager gave him the money, and the intruder fled.

At some point on April 5, 2006, Sergeant John Joy of the Jersey City Police Department received a phone call that prompted him to go to 30 Kensington Avenue looking for a specific vehicle. He found the

vehicle, a silver Mercury Cougar, parked on Kensington Avenue and, between 6:00 and 7:00 p.m., he and Detective Wael Shahid set up surveillance of the Cougar in two separate police units. Several hours later, the officers observed a black male enter the vehicle and drive off, eastbound. They followed, and along with several other units including one operated by Sergeant Michael Kolodij, began a zigzag surveillance.

The police followed the vehicle to a Wendy's in Bayonne and watched as it slowly circled the restaurant without parking or going through the drive-thru. The driver of the vehicle then drove back to 30 Kensington Avenue, parked, and went inside. Sgt. Joy and Det. Shahid continued their surveillance, and observed as the driver re-emerged thirty minutes later and again drove off. Multiple units, again including Sgt. Kolodij's, followed the vehicle to a nearby McDonald's arriving at 11:09 p.m., and watched as the vehicle slowly circled the building before pulling into the drive-thru lane.

At this point, the various units were advised to "move in" in order to prevent a possible robbery, and Sgt. Kolodij pulled his car in front of the drive-thru lane, blocking both the Cougar and another vehicle. The officer approached the passenger side of the Cougar and opened the door. He saw the driver reach into his front pocket and start to pull out a black nine-millimeter automatic weapon. The officer yelled "gun," drew his own weapon and pointed it at the driver. He told the driver to stop what he was doing, and the driver complied. The officer then grabbed the gun, which was protruding from the driver's right front pocket. Det. Shahid ran to the driver's side door and pulled the driver, later identified as [Petitioner], out of the car, and he was placed under arrest. The detective searched the car and discovered a black face mask in the rear passenger seat area.

[Petitioner] was transported to the major case office and briefly placed in a holding cell. He was then brought to an office shared by six or seven detectives, and Detective Victor Cherry advised him of his rights at 12:45 a.m. The detective told [Petitioner] the police believed he had been involved in a string of robberies. For approximately forty-five minutes [Petitioner] denied any involvement in, or knowledge of, any such robberies, but eventually he agreed to give sworn statements regarding them. Several detectives became involved in taking statements from defendant, including Detectives Cherry, Jose Alvarez, and Michael Gajewski. [Petitioner] was re-advised of his right to remain silent prior to every statement.

> [Petitioner] initially claimed that some of the robberies were not committed by him but by people he knew. However, eventually [Petitioner] admitted he was one of the perpetrators, explaining that he lied earlier because he was scared. In particular, [Petitioner] admitted to directly participating in the robberies at Cherry's Bar . . . , at Bill & Ruth's . . . , and the Santa Domingo Hair Salon…, and at the Virginia Tavern . . .  He also admitted to: (1) serving as the lookout during the armed robbery of Monique's Techniques…;(2) loaning his girlfriend's silver Cougar to an individual who robbed the Burger King on Route 440 . . . ; (3) loaning a jacket to an individual who robbed the Burger King on Bergen Avenue . . . ; and (4) loaning the Cougar to an individual who robbed the Wendy's on Route 440 . . .
>
> [Petitioner] gave statements until 5:04 p.m. on April 6, 2006.

*State v. Williams*, No. A-3084-10T4, 2012 WL 6652511 at *2–5 (N.J. Super. Ct. App. Div. Dec. 24, 2012).

A grand jury returned an indictment containing 111 separate counts against Petitioner: 27 counts of first-degree armed robbery, N.J.S.A. § 2C:15-1; 42 counts of second-degree possession of a handgun for an unlawful purpose, N.J.S.A. § 2C:39-4(a); 14 counts of third-degree possession of a handgun without a permit, N.J.S.A. § 2C:9-5(b); seven counts of second-degree conspiracy to commit armed robbery, N.J.S.A. § 2C:15-1 and N.J.S.A. § 2C:5-2; three counts of fourth-degree aggravated assault, N.J.S.A. § 2C:12-1(b)(4); one count of second-degree attempted armed robbery, N.J.S.A. § 2C:15-1 and N.J.S.A. § 2C: 5-1; one count of fourth-degree defacement of a weapon, N.J.S.A. § 2C:39-9(e); and one count of fourth-degree possession of a prohibited weapon, N.J.S.A. § 2C:39-3(f). *See Williams*, 2012 WL 6652511 at *1.

Pursuant to a plea agreement, Petitioner pled guilty to seven counts of armed robbery (counts 17, 18, 28, 38, 41, 64, and 100). *Id.* Petitioner agreed to testify against any co-defendant who did not resolve his case prior to trial. In exchange, the State agreed to recommend that Petitioner receive a fifteen-year custodial sentence with an 85% parole disqualifier. *Id.*

On November 29, 2007, Petitioner testified at the trial of co-defendant Bradley Burgess. *Id.* At trial, Petitioner admitted to his role in various armed robberies, but he insisted that Burgess, whom Petitioner had originally implicated in his statements to police, did not actually participate in his charged robbery. *Id.* Following his testimony, the State moved to vacate Petitioner's plea because Petitioner violated his plea agreement. *Id.* On March 14, 2008, the Court granted the State's unopposed motion. *Id.*

Petitioner's trial took place between September 14, 2009 and September 28, 2009. *Id.* at *2. On September 21, 2009, the trial court granted the State's motion to dismiss counts 38 to 40, 52 to 60, 77 to 81, 88 to 93, and 100 to 106. The trial court subsequently dismissed as cumulative counts 12 to 13, 22 to 24, 32 to 34, 46 to 48, 67 to 68, 73 to 75, 85 to 86, and 96 to 97. *Id.* On September 28, 2009, a jury acquitted Petitioner on counts 11, 14, 18 to 21, 25, 36, 39, 72, 76, 84, 87, 95, and 98. The jury convicted Petitioner on all the remaining counts. *Id.*

On January 8, 2010, after the court merged some of Petitioner's convictions and sentenced him to an aggregate custodial term of 40 years subject to the 85% parole disqualifier of the No Early Release Act ("NERA"), N.J.S.A. § 2C:43-7.2.

On December 24, 2012, the Appellate Division reversed Petitioner's convictions on counts 28 to 29, 42, and 64, and remanded the matter to correct the judgment of conviction. *See Williams*, 2012 WL 665251. The remainder of Petitioner's judgment of sentence was affirmed. *Id.* On July 12, 2013, the New Jersey Supreme Court denied Petitioner's petition for certification. *State v. Williams*, 68 A.3d 890 (2013). On May 9, 2014, an amended judgment of conviction was entered in accordance with the Appellate Division's opinion. (D.E. No. 7, Ex. 12).

Petitioner filed a petition for post-conviction relief ("PCR") on March 10, 2004. (*Id.*, Ex. 13). An evidentiary hearing was held on January 15, 2015. (*Id.*, Ex. 48). On January 28, 2015,

the state PCR court denied his petition.  (*See* D.E. No. 7, Ex. 17).  The Appellate Division affirmed. *See State v. Williams*, No. A-4090-14T3, 2017 WL 74769 (N.J. Super. Ct. App. Div. Feb. 27, 2017).  Petitioner's petition for certification to the New Jersey Supreme Court was denied.  (D.E. No. 7, Ex. 22).

Petitioner filed his Petition on January 29, 2018.  (D.E. No. 1).  Petitioner asserts three grounds for relief: (i) ineffective assistance of trial counsel for offering improper advice concerning the admissibility of Petitioner's prior testimony at co-defendant's trial, which adversely affected Petitioner's decision to reject a plea offer; (ii) the trial court erred in admitting Petitioner's custodial statements in violation of his due process rights; and (iii) his confrontation clause rights were violated at trial by the introduction of evidence concerning why the police began to surveil him.  (D.E. No. 1).  Respondents filed an answer.  (D.E. No. 7).  Petitioner filed a reply on June 1, 2018.  (D.E. No. 8).

## II.    STANDARDS OF REVIEW

Under the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"), 28 U.S.C. § 2254, the district court "shall entertain an application for writ of habeas corpus in behalf of a person in custody pursuant to the judgment of a State court only on the ground that he is in custody in violation of the Constitution or laws or treaties of the United States."  Habeas petitioners bear the burden of establishing their entitlement to relief for each claim presented in a petition based upon the record that was before the state court.  *See Eley v. Erickson*, 712 F.3d 837, 846 (3d Cir. 2013).  District courts must defer to the determinations of the state trial and appellate courts. *Renico v. Lett*, 559 U.S. 766, 772–73 (2010).  Moreover, a federal court reviewing the state court's adjudication under § 2254(d)(1) must confine its examination to evidence in the record.  *Cullen v. Pinholster*, 563 U.S. 170, 181–82 (2011).

Where a claim has been adjudicated on the merits by the state courts, a district court may not grant an application for writ of habeas corpus unless the state court adjudication:

> (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States: or
>
> (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254(d).

"Contrary to clearly established Federal law" means the state court applied a rule that contradicted the governing law set forth by the Supreme Court of the United States, or that the state court confronted a set of facts that were materially indistinguishable from Supreme Court precedent and arrived at a different result than the Supreme Court. *Eley*, 712 F.3d at 846 (citing *Williams v. Taylor*, 529 U.S. 362, 405–06 (2000)). Federal law is clearly established for these purposes where it is clearly expressed in "only the holdings, as opposed to the dicta," of the opinions of the Supreme Court. *See Woods v. Donald*, 575 U.S. 312, 316 (2015). An "unreasonable application" of clearly established federal law is an "objectively unreasonable" application of law, not merely an erroneous application. *Eley*, 712 F.3d at 846 (quoting *Renico*, 559 U.S. at 773).

"When reviewing state criminal convictions on collateral review, federal judges are required to afford state courts due respect by overturning their decisions only when there could be no reasonable dispute that they were wrong." *Woods*, 557 U.S. at 316. Where a petitioner challenges an allegedly erroneous factual determination of the state courts, "a determination of a factual issue made by a State court shall be presumed to be correct [and t]he applicant shall have the burden of rebutting the presumption of correctness by clear and convincing evidence.

28 U.S.C. § 2254(e)(1).  Furthermore, "[w]hen a state court arrives at a factual finding based on credibility determinations, the habeas court must determine whether that credibility determination was unreasonable."  *See Keith v. Pennsylvania*, 484 F. App'x 694, 697 (3d Cir. 2012) (citing *Rice v. Collins*, 546 U.S. 333, 339 (2006)).

## III.   DISCUSSION

### A.   Ground One: Ineffective Assistance of Counsel for Failure to Provide Proper Advice

In ground one, Petitioner alleges his trial counsel was ineffective for failing to properly advise him concerning the admissibility of his prior testimony at co-defendant Burgess's trial. (D.E. No. 1 at 8).[2]  Petitioner claims this adversely affected his decision regarding a plea offer. (*Id.*).

The Sixth Amendment, applicable to states through the Due Process Clause of the Fourteenth Amendment, guarantees the accused the "right . . . to have the Assistance of Counsel for his defense."  U.S. Const. amend. VI.  The right to counsel is the right to the effective assistance of counsel, and counsel can deprive a defendant of the right by failing to render adequate legal assistance.  *See Strickland v. Washington*, 466 U.S. 668, 686 (1984).

A claim that counsel's assistance was so defective as to require reversal of a conviction has two components, both of which must be satisfied.  *See Strickland*, 466 U.S. at 687.  To establish an ineffective assistance of counsel claim, a petitioner must first prove "counsel's representation fell below an objective standard of reasonableness."  *Id.* at 688.  In analyzing counsel's performance, the court must be "highly deferential."  *Id.* at 689.  The Supreme Court explained:

> A fair assessment of attorney performance requires that every effort be made to eliminate the distorting effects of hindsight, to reconstruct the circumstance of counsel's challenged conduct, and to evaluate the conduct from counsel's perspective at the

---

[2]     Pin cites to D.E. No. 1 are to the pagination automatically generated by the CM/ECF.

> time.  Because of the difficulties inherent in making the evaluation, a court must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance; that is, the defendant must overcome the presumption that, under the circumstances, the challenged action "might be considered sound trial strategy."

*Id.* (quoting *Michel v. Louisiana*, 350 U.S. 91, 101 (1955)).  A convicted defendant asserting ineffective assistance must therefore identify the acts or omissions that are alleged not to have been the result of reasoned professional judgment.  *Strickland*, 466 U.S. at 690.  The reviewing court then must determine whether, in light of all the circumstances, the identified acts or omissions were outside "the wide range of professionally competent assistance."  *Id.*  It follows that counsel cannot be ineffective for declining to raise a meritless issue.  *See Premo v. Moore*, 562 U.S. 115, 124 (2011).

When the second part of the *Strickland* test requires a petitioner to demonstrate that counsel's performance "prejudiced the defense" by depriving petitioner of "a fair trial, a trial whose result is reliable."  *Strickland*, 466 U.S. at 687.  To establish prejudice, a petitioner must show "there is a reasonable probability that, but for counsel's unprofessional error, the result of the proceeding would have been different."  *Id.* at 694.

If a petitioner fails to satisfy either prong of the *Strickland* test, it is unnecessary to evaluate the other prong, because a petitioner must prove both prongs to establish an ineffectiveness claim.  *Id.* at 697.  Moreover, "if it is easier to dispose of an ineffectiveness claim on the ground of lack of sufficient prejudice . . . that course should be followed."  *Id.*

When assessing an ineffective assistance of counsel claim in the federal habeas context, "[t]he pivotal question is whether the state court's application of the *Strickland* standard was unreasonable," which "is different from asking whether defense counsel's performance fell below *Strickland's* standard."  *Grant v. Lockett*, 709 F.3d 224, 232 (3d Cir. 2013) (quoting *Harrington v.*

*Richter*, 562 U.S. 86, 101 (2011)).  "A state court must be granted a deference and latitude that are not in operation when the case involves [direct] review under the Strickland standard itself."  *Id.* Federal habeas review of ineffective assistance of counsel claims is thus "doubly deferential." *Id.* (quoting *Pinholster*, 563 U.S. at 190). Federal habeas courts must "take a highly deferential look at counsel's performance" under *Strickland*, "through the deferential lens of § 2254(d)."  *Id.* (internal quotation marks and citations omitted).

Petitioner implicated himself and denied any involvement in the robberies by Burgess at Burgess's trial.  Following that trial, the State moved to vacate Petitioner's guilty plea.  During the hearing on the State's motion, defense counsel noted she was not opposing the State's motion to vacate his plea because Petitioner advised her not to. (D.E. No. 7, Ex. 27, at 4:16–19).  Defense counsel also noted on the record that she advised Petitioner that counsel was prepared to argue against the motion to vacate Petitioner's plea.  (*Id.* at 7:10–17).

Defense counsel continued as follows:

> [Defense counsel]:  And you're also aware that you did come to court and testify at the trial in the matter of *State v. Bradley Burgess*, correct?
>
> [Petitioner]: Yes.
>
> [Defense counsel]: And it's my understanding that at that time you also made statements that may implicate yourself, correct?
>
> [Petitioner]: Yes.
>
> [Defense counsel]: And you're aware that if your case goes to trial, the State may be able to use those statements that you made?
>
> [Defendant]: Yes.
>
> [Defense counsel]: And the only way that that would happen, the case would proceed to trial is if the Judge takes back your guilty plea, correct?

> [Defendant]: Yes.
>
> [Defense counsel]: And did you instruct me, knowing all of that, that you did not want me to oppose this motion?
>
> [Defendant]: Yes.
>
> [Defense counsel]: Who made that decision?
>
> [Defendant]: I did.
>
> [Defense counsel]: Is [] your decision made voluntarily?
>
> [Defendant]: Yes.
>
> [Defense counsel]: And I advised you with regards to the consequences and what could take place if… we did not oppose this motion.
>
> [Defendant]: Right.

(*Id.* at 5:18–25 to 6:1–21).

Petitioner argues that trial counsel was ineffective by advising him his videotaped testimony in Burgess's trial, in which implicated himself, would not be admitted at his trial unless he testified.  (D.E. No. 1, at 9).  Petitioner argues he would have opposed the State's motion to vacate Petitioner's plea offer if he had known his prior testimony was admissible at his trial.[3]  (*Id.*).  Petitioner claims he needed to know the admissibility of the videotaped testimony in order to make an informed decision.  (*Id.*).  Petitioner acknowledges he did testify at trial; however, he says he did so because after the videotaped testimony was admitted at trial, trial counsel advised him that "there was nothing left to do."  (*Id.*).

---

[3]        Petitioner specifically argues he "would have accepted the state's plea offer."  (D.E. No. 1 at 9).  However, based on the Court's review of the record, including the PCR hearing transcript, it appears that Petitioner is arguing he would have opposed the state's motion to vacate Petitioner's plea and attempted to proceed with his plea.  (*See* D.E. 7-48 at 40:1–8).

Petitioner raised this claim in his PCR petition.  (D.E. No. 7, Ex. 13).  Petitioner testified at his PCR hearing that his trial attorney told him if he did not testify at his trial, the videotaped testimony he gave at his co-defendant's trial could not be introduced against him.  (D.E. No. 7, Ex 48 at 5:14–16).  Petitioner testified that, had he known the videotape would be admitted into evidence at his trial, he would have taken the plea bargain and would never have gone to trial.  (*Id.* at 5:22–24).  However, on cross-examination, Petitioner acknowledged he had also given fourteen separate statements to the police implicating himself in the robberies.  (*Id.* at 10:8–10).  Petitioner also acknowledged that trial counsel informed petitioner that if those statements were not suppressed, they could be used against him at trial.  (*Id.* at 22:1–6).  Petitioner also testified that trial counsel explained to him that the only way the State could use his statements would be if the Court granted the State's motion to vacate his guilty plea.  (*Id.* at 25:15–19).

At the evidentiary PCR hearing, trial counsel testified the State advised her at the time of the plea cutoff what evidence the State had that they could use against him.  (*Id.* at 42:4–14).  The State had not indicated it would seek to admit Petitioner's testimony from Burgess's trial during the plea cutoff.  (*Id.* at 88:20–24).  Trial counsel believed that because the State filed the motion to vacate the plea based on Petitioner's testimony at the Burgess trial, it could not then benefit by using that testimony against him.  (*Id.* at 41:13–23).  Trial counsel's position was that the court improperly allowed the testimony from the Burgess trial to be admitted at Petitioner's trial.  (*Id.* at 79:5–10).

The PCR Court denied Petitioner's claim, finding "while trial counsel incorrectly advised Petitioner that his testimony at the co-defendant's trial would only be admissible if he were to testify, Petitioner cannot show he suffered prejudice as a result."  (D.E. No. 7, Ex. 17 at 4).  The Appellate Division affirmed the dismissal of this claim based on failure to meet *Strickland*'s

prejudice prong. *Williams*, 2017 WL 745769.  The Appellate Division explained that although the PCR Court found trial counsel's evidentiary hearing testimony that she strenuously and repeatedly argued against the admissibility of petitioner's Burgess trial testimony supported Petitioner's claim that counsel misinformed him regarding the admissibility of the testimony, the PCR Court properly found that Petitioner could not show that he suffered prejudice as a result. *Id.* at \*3.  In evaluating the potential prejudice to Petitioner, the Appellate Division explained as follows:

> The judge rejected as not credible [Petitioner's] testimony that had he known his testimony from codefendant's trial could have been used at his trial, he would not have refused the plea offer.  The judge noted that in his [fourteen admissible] confessions, [Petitioner] admitted to directly participating in robbing the establishments and serving as the lookout during the robbery of a fifth establishment.  The judge also cited instances in other statements where [Petitioner] admitted to participating to some degree in other robberies.

*Id.*  The Appellate Division noted Petitioner was claiming his decision to reject a plea was based on trial counsel's erroneous advice about the use of his Burgess trial testimony, yet Petitioner's decision was "seemingly unaffected" by his fourteen admissible confessions. *Id.* at \*4.  Thus, the Appellate Division found that petitioner failed to establish the second prong of *Strickland*. *Id.*

Given that failure to meet either prong of the constitutional test defeats ineffective assistance of counsel claims, *see United States v. Cross*, 308 F.3d 308, 315 (3d Cir. 2002), the Appellate Division decision was not contrary to and did not unreasonably apply *Strickland*.  Petitioner alleges that his decision to proceed to trial was based on his belief that his videotaped testimony would be inadmissible at his trial.  However, Petitioner clearly acknowledges that he gave fourteen additional statements to police implicating himself in the robberies.  (D.E. No. 7, Ex. 48, 10:8–10).  More importantly, at the time Petitioner chose not to oppose the state's motion to vacate his plea, Petitioner also acknowledged that he was aware that those fourteen statements may be used against him at trial.  (*Id.* at 22:1–6).  With Petitioner's admitted knowledge that his

fourteen statements to the police were potentially admissible at his trial, Petitioner fails to show "there is a reasonable probability" that if he had known this one additional piece of evidence—i.e., the videotaped Brugess trial testimony—would also be admitted, he would have taken the plea offer. *Strickland*, 466 U.S. at 694. Moreover, Petitioner has made no showing that opposing the State's motion to vacate would have been successful.

In sum, Petitioner has not shown that adjudication of his ineffective assistance of counsel claim by the Appellate Division was contrary to, or involved an unreasonable application of, *Strickland* and its progeny. *See Premo v. Moore*, 562 U.S. 115, 122 (2011) (citation omitted) (when the *Strickland* analysis is combined with 28 U.S.C. § 2254(d), federal habeas courts' analysis is "doubly" deferential to both the state court and the defense counsel). Habeas relief is thus denied as to ground one.

### B.    Ground Two:  Violation of Due Process for Admission of Custodial Statements

In ground two, Petitioner argues admitting his custodial statements, which implicated himself in the robberies, violated his right to due process. (D.E. 1 at 11). Petitioner alleges that the statements were induced through coercive tactics. (*Id.*).

Although state-court evidentiary rulings are generally not cognizable in federal habeas claims, a petitioner may nonetheless be entitled to relief if he can show that the use of the evidence caused a "fundamental unfairness" at trial in violation of his due process rights. *See Kontakis v. Beyer*, 19 F.3d 110, 120 (3d Cir. 1994) (citing *Lisenba v. California*, 314 U.S. 219, 236 (1941)). The United States Supreme Court has "defined the category of infractions that violate 'fundamental fairness' very narrowly." *Dowling v. United States*, 493 U.S. 342, 352 (1990).

Pursuant to the Due Process Clause of the Fourteenth Amendment, a confession must be voluntary to be admitted into evidence. *See Dickerson v. United States*, 530 U.S. 428, 433 (2000).

The Supreme Court has held that a statement or confession is involuntary when the suspect's "will was overborne in such a way as to render his confession the product of coercion." *Arizona v. Fulminante*, 499 U.S. 279, 288 (1991). "[C]oercive police activity is a necessary predicate to the finding that a confession is not 'voluntary.'" *Colorado v. Connelly*, 479 U.S. 157, 167 (1986). A court determines if a confession was voluntary by evaluating the "totality of the circumstances surrounding the interrogation" to determine if the defendant made an uncoerced choice and had the requisite level of comprehension. *See Fare v. Michael C.*, 442 U.S. 707, 725 (1979); *Miller v. Fenton*, 796 F.2d 598, 604 (3d Cir. 1986). "[C]oercion can be mental as well as physical." *Blackburn v. Alabama*, 361 U.S. 199, 206 (1960). When determining voluntariness under the totality of the circumstances, courts must consider a number of factors in addition to "the crucial element of police coercion," such as "the length of the interrogation, its location, its continuity, the defendant's maturity, education, physical condition, and mental health," and the failure of police to advise the defendant of his *Miranda* rights.[4] *Withrow v. Williams*, 507 U.S. 680, 693–94 (1993); *see also Schneckloth v. Bustamonte*, 412 U.S. 218, 226 (1973) (discussing factors).

"The ultimate issue of voluntariness is a legal question requiring an independent federal determination." *Lam v. Kelchner*, 304 F.3d 256, 264 (3d Cir. 2002) ("[U]nder the AEDPA habeas standard, we are required to determine whether the state court's legal determination of voluntariness was contrary to or an unreasonable application of Supreme Court precedent.") (citing *Miller v. Fenton*, 474 U.S. 104, 110 (1985)). Determinations of factual issues by state courts, such as whether police used intimidation tactics, are given a presumption of correctness, which may be rebutted by clear and convincing evidence to the contrary. *See Miller*, 474 U.S. at 112 (a state court's findings on subsidiary questions in determining voluntariness of a confession are

---

[4]     *Miranda v. Arizona*, 384 U.S. 436 (1996).

conclusive on habeas review absent clear and convincing evidence to the contrary); *see also Sweet v. Tennis*, 386 F. App'x 342, 345 (3d Cir. 2010).   Thus, the Court must examine the facts surrounding Petitioner's police interviews in order to determine if the state court's holding was contrary to, or an unreasonable application of, clearly established federal law.

Petitioner alleges his statements were the product of the following circumstances and coercive tactics: (i) he was twenty years old at the time; (ii) he had no prior experience with the law; (iii) he was not allowed to call his mother for hours; (iv) he was subjected to a grueling interrogation by multiple officers over the course of nearly twenty-four hours; (v) he was deprived of sleep and food during this period; (vi) he was handcuffed almost the entire time; (vii) the officers wrongly told Petitioner that they would let him go if they were to verify his stated reason for being at the McDonald's where Petitioner was arrested; and (viii) the officers threatened Petitioner that if he did not reveal who committed the robberies, they would prepare reports that would ensure that he went to prison for life.  (D.E. 1 at 11).

On direct appeal, the Appellate Division deferred to the trial court's credibility determinations that led to the finding that Petitioner's statements were knowing and voluntary. *Williams*, 2012 WL 6652511 at *11.  The Appellate Division summarized the following testimony from Petitioner's *Miranda* hearing:

> [T]he State presented testimony from Detectives Cherry, Gajewski, and Alvarez regarding the events surrounding [Petitioner's] interrogation.   Det. Cherry testified that after [Petitioner] was arrested at about 11:09 p.m. he was brought straight to the major crimes office so the detective could speak with him.  During a pre-interview, Det. Cherry advised [Petitioner] that there had recently been seventeen or eighteen armed robberies in Jersey City, and asked if he knew anything about this.  For approximately forty-five minutes, [Petitioner] denied any knowledge or involvement.  The detective then told [Petitioner] about another case he had worked on involving multiple armed robberies and the jail time the perpetrators were facing.  [Petitioner] then stated he wanted to do the right thing

and to confess, and asked if Det. Cherry could help him out.  Det. Cherry said he was not in a position to do anything but he would take down what [Petitioner] had to say.

[Petitioner] waived his right to remain silent by executing a waiver form at 12:45 a.m., and began to discuss the robberies with Det. Cherry.  Eventually Det. Cherry, and then Detectives Gajewski and Alvarez began taking formal statements from [Petitioner,] each of which was preceded by the execution of a new waiver form. [Petitioner] reviewed the statements for accuracy and signed them. [Petitioner] continued to give statements until shortly after 5:00 p.m.

All three detectives confirmed that they interviewed [Petitioner] in the relatively large major cases office, not a cell, and that there were several detectives present.  According to Det. Alvarez, [Petitioner] was only briefly remanded to a cell once during the day.  [Petitioner] was given breaks for food and water, and to use the bathroom.  He never asked to speak with an attorney or to rest, and did not appear tired.

Both Detectives Cherry and Alvarez maintained that [Petitioner] was not handcuffed when they spoke with him, but was sitting unrestrained next to their desks.  Det. Gajewski acknowledged that [Petitioner] was handcuffed to the chair by his non-writing hand when he spoke with him.  Det. Cherry denied that [Petitioner] was shown police reports regarding the various robberies, or that he threatened [Petitioner] in any way.  Both Detectives Cherry and Alvarez confirmed that, every time [Petitioner] gave a statement, he was advised of the charges he was facing.

*Id.* at *9–10.  The trial court found the detectives testified "extremely" credibly regarding the events surrounding the statements.  *Id.* at *10.  The Appellate Division deferred to the trial court's credibility findings as to the detectives' testimony.  *Id.* at *11.  The Appellate Division noted that the trial court found that while the "questioning did continue for a very protracted period, multiple officers indicated that [Petitioner] did not appear tired or ask to rest, but instead seemed to want to 'get things over with'" and "some time was lost when certain statements had to be retaken after [Petitioner] changed his testimony."  *Id.* at *10.  The Appellate Division noted the detectives testified Petitioner was not handcuffed or deprived of food the entire time he was questioned.  *Id.*

at *11.  Additionally, Petitioner was not denied the opportunity to make phone calls, and he was not threatened.  *Id.*  The Appellate Division considered that Petitioner was young and inexperienced with the law, and noted that Petitioner was repeatedly advised of his rights and confirmed that he understood them.  *Id.*  Petitioner was also interviewed by only one detective at a time and began to confess after a relatively short period of time.  *Id.*  The Appellate Division found overall, the record did not reflect an interrogation unusual in terms of length or police procedure.  *Id.*  Thus, the Appellate Division agreed with the trial court's finding that Petitioner's statements were made knowingly and voluntarily.  *Id.*

Considering Petitioner's choice to waive his *Miranda* rights, the breaks he was given, the lack of restraints, and the fact that he started to give statements approximately forty-five minutes into his interrogation, the record does not support a conclusion that Petitioner's will was in any way overborn.  Nor does the record support the conclusion that Petitioner's statements to the police were in any way coerced or the result of improper police conduct.  Having reviewed the record, it is clear Petitioner's statements were not coerced, and Petitioner has not shown that the circumstances of the interrogation require the suppression or that his statements should be viewed as unreliable due to police coercion.  *Lam*, 304 F.3d at 264.

The Appellate Division considered the "totality of the circumstance surrounding the interrogation," as required by the United States Supreme Court, to determine if the defendant made an uncoerced choice and had the requisite level of comprehension.  *See Fare*, 442 U.S. at 725.  Thus, the state court's holding with regard to this claim was not contrary to, nor did it involve an unreasonable application of, clearly established Supreme Court precedent.  Furthermore, the decision was not based on an unreasonable determination of the facts in light of the evidence presented.   Petitioner is not entitled to habeas relief on this claim.

19

C.      **Ground Three: Right to Confront Witnesses**

In ground three, Petitioner argues testimony admitted at trial, specifically regarding why the police began to surveil him, violated his right to confrontation.  (D.E. No. 1 at 13).  More particularly, Petitioner argues the testimony from Sergeant Joy regarding a tip from a concerned citizen about a specific vehicle and the vehicle's location, which culminated in Petitioner's arrest, led to the inescapable conclusion that the non-testifying concerned citizen informed Sergeant Joy that Petitioner was involved in criminal activity.  (*Id.*).

Whether a statement is hearsay "frequently turns on the purpose for which it is offered." *United States v. Sallins*, 993 F.2d 344, 346 (3d Cir. 1993).  It is permissible for police officers to reveal out-of-court statements when they do so for the "limited purpose of establishing background for the officers' actions" rather than for establishing the truth of the matter asserted.  *Id.*

In *Sallins*, the arresting officer revealed the contents of a police radio dispatch in his testimony—specifically, "that there was . . . a black male dressed in all black with a gun on the 2500 block of North Franklin Street."  *Id.* at 345–46.  Although the Government argued that this out-of-court statement was included only to establish the background of the officer's actions, the court held that it was impermissible hearsay because the officer could have established the background of his actions without revealing the contents of the dispatch.  *Id.* at 346–47.

On direct appeal in this case, the Appellate Division applied *State v. Bankston*, 63 N.J. 263 (1973), which follows the ruling in *Sallins*.  The Appellate Division reasoned that the New Jersey Supreme Court "confirmed that the hearsay rule is not violated when a police officer explains that he approached a suspect or went to a crime scene based 'upon information received,' because such testimony explains his subsequent conduct and shows that the officer was not acting in an arbitrary manner."  *Williams*, 2012 WL 6652511 at *12.  The Appellate Division explained that the

*Bankston* Court cautioned "that both the hearsay rule and an accused's Sixth Amendment right to be confronted by the witnesses against him or her are violated if the officer becomes more specific and repeats what another person told the officer linking the defendant to a crime." *Id.* (citing *Bankston*, 63 N.J. at 268-69).

The Appellate Division found "Sgt. Joy's testimony did not lead to the inescapable conclusion that the 'concerned citizen' had specifically advised that [Petitioner] was involved in criminal activity." *Id.* at *13. "The information provided here," the Appellate Division explained, "pertained to an address and a car. The car did not belong to [Petitioner] and it was never established the [Petitioner] was the only individual residing at 30 Kensington." *Id.* at *13.

Sergeant Joy did not reveal in his testimony the contents of his conversation with the informant, but simply indicated that law enforcement actions—surveying the area of 30 Kensington Avenue, looking for a particular vehicle—were based on information received from an informant. (D.E. No. 7, Ex. 36 at 39:10, 41:4–18). This merely established the background of the police action and did not reveal any content or information relevant to Petitioner. The Appellate Division's ruling was not contrary to, and did not involve an unreasonable application of, clearly established Supreme Court precedent. Sergeant Joy's testimony regarding the confidential informant's statement does not warrant an objectionable Confrontation Clause violation. Petitioner is therefore not entitled to habeas relief on ground three.

## IV.    CERTIFICATE OF APPEALABILITY

Pursuant to 28 U.S.C. § 2253(c), a petitioner may not appeal from a final order in a habeas proceeding where that petitioner's detention arises out of a state court proceeding unless he has "made a substantial showing of the denial of a constitutional right." "A petitioner satisfies this standard by demonstrating that jurists of reason could disagree with the district court's resolution

of his constitutional claims or that jurists could conclude that the issues presented here are adequate to deserve encouragement to proceed further." *Miller-El v. Cockrell*, 537 U.S. 322, 327 (2003). For the reasons expressed above, Petitioner's claims are all without merit and jurists of reason would not disagree with this Court's denial of Petitioner's entire habeas petition. Petitioner is therefore denied a certificate of appealability.

## V.    CONCLUSION

For the reasons stated above, Petitioner's petition for a writ of habeas corpus is DENIED, and a certificate of appealability shall NOT ISSUE. An appropriate Order follows.

Dated: January 7, 2022                                    */s/Esther Salas*
                                                         Esther Salas, U.S.D.J.